## FEDERMAN, Plaintiff, v. STANWYCK et, Defendant.

Common Pleas Court, Cuyahoga County.

No. 606061. Decided December 26, 1951.

170

Alfred A. Frost, David Perris, Cleveland, for plaintiff.
D. A. Harrington, Robert A. Good, Cleveland, for defendant.

### OPINION

By BLYTHIN, J.:

The plaintiff Ben R. Federman brings his action seeking to set aside the cancellation of a mortgage and names as the principal defendants Edward J. Stanwyck and his wife Tillie. The plaintiff in his amended petition sets forth his claim in two causes of action.

In the first cause he claims that on or about the 1st day of June, 1944, the defendants executed and delivered to him their note in the sum of $6,558.53 secured by a mortgage on the home of the defendants on Lipton Avenue in the city of Cleveland. The note was payable in monthly installments of $40.00 each, and provided for interest at the rate of 3% per annum. It was to mature August 1st, 1954. The mortgage was duly recorded and became a lien on the home, and it is claimed in the amended petition that only two payments of

$40.00 each have been made on the note. He claims further that on April 15, 1948, the Stanwyck defendants filed with the County Recorder a purported cancellation of the mortgage and that he, the plaintiff, did not execute such cancellation, that the debt has not been paid and that the pretended cancellation was without consideration.

In his second cause of action the plaintiff includes his claims already stated and says further that at no time was it his intention or purpose to execute any cancellation of the mortgage and that if his signature appears thereon the signature was procured without his knowledge or consent and not by his own free will and volition, and that the Stanwyck defendants procured it by fraud and undue influence. By reason of those claims he prays for a rescission of the purported cancellation and restoration of the mortgage and its lien.

By answer the Stanwyck defendants admit the execution of the note and mortgage and the recording by them of the cancellation thereof and assert that the cancellation was executed by the plaintiff and delivered to them. They then proceed to deny all else claimed in the amended petition.

On issue so joined two important questions of fact are first to be answered:

1. Did the plaintiff execute the cancellation and deliver the so-cancelled mortgage and note?

2. If the answer to No. 1 is in the affirmative, was such action on his part without his knowledge, or was it induced by fraud or undue influence, as he claimed?

The plaintiff is a man now 75 or 76 years of age; kindly, generous and undoubtedly bearing an irreproachable character. He is alert, is a business man (real estate) and on the basis of his appearance and testimony appears to be a very active individual. In the late 1930's he became acquainted with the defendant Tillie Stanwyck who then was not married to Edward Stanwyck. She was then a widow or was divorced, and had two minor children of tender years.

She became employed by the plaintiff. The plaintiff became genuinely interested in her welfare and in the welfare of her little ones and did a great deal for them, and there is no doubt whatever about his conduct and generosity being very helpful to them and being very pleasing to him. There came a time when the defendant Edward Stanwyck appeared on the scene and it is clear that Tillie discussed with the plaintiff her intention to marry the defendant Edward Stanwyck. This seemed quite pleasing to the plaintiff and the Stanwycks were married in 1941. The plaintiff's friendship for and interest in the family continued for years beyond the marriage of Edward and Tillie and it was a very mutually agreeable

friendship. In the meantime the plaintiff helped the little family in many ways and the little family reciprocated his kindness. Whenever he was ill he was welcome at the Stanwyck home and it is not denied that the Stanwycks cared for him in a proper and gentle and generous manner. The plaintiff helped the family financially and there is no escape from the belief that the help which he gave to the family was voluntarily and willingly given and was a source of great pleasure to the plaintiff. He assisted the family in securing a home and in a trade transaction by which a more suitable home (the one now owned by the Stanwycks) was acquired. There came a time in 1944 when the parties in a frank and kindly manner discussed their financial relationship and the plaintiff estimated that he had advanced to the Stanwycks from time to time the sum of $6,558.53 which is the amount of the mortgage, and it was suggested that they give to him a note and mortgage and those are the note and mortgage now in issue.

The plaintiff alleges in his amended petition that only two payments of $40.00 each were ever made on that mortgage note. Upon trial he admitted that three or four payments were made. Examination of the mortgage note discloses endorsements indicating twenty payments on the note plus some interest payment. Tillie Stanwyck admits that the interest payments that are not in the hand writing of the plaintiff are in her hand writing and the testimony by the Stanwycks is to the effect that the payments were made but the plaintiff denies they were made. Tillie Stanwyck performed services for plaintiff and had proper access to his records, including the mortgage and note in question. The testimony of the Stanwycks is to the effect that the plaintiff, early in 1948, discussed with Mrs. Stanwyck the whole situation and indicated to her that it was his judgment that to have the property in the joint names was a risky proposition for the little family because of the fact that the husband did a good deal of driving the family automobile, and might become involved in serious liability should he meet with some unfortunate accident in his driving operations. Plaintiff then stated that he thought that Edward Stanwyck should convey his interest in the property to Tillie and that if Edward was willing to do so he, the plaintiff, would cancel his note and mortgage and deliver them to the Stanwycks so that the wife and the two children would definitely be protected.

Mrs. Stanwyck testified that she informed the plaintiff that she did not know how Edward would feel about that but that she would talk with him. Edward made no objection and it

is testified by the Stanwycks that the plaintiff proceeded to prepare a quit claim deed conveying the interest of Edward to Tillie, and that he further proceeded to call a meeting at the home of Adolph H. Shagrin for the purpose of executing the deed, cancelling the note and delivering the note and mortgage.

The Stanwycks called for the plaintiff at his home or office on the designated evening, and they together proceeded to the Shagrin home where the quit claim deed, Plaintiff's Exhibit 1, was executed by Edward J. Stanwyck and witnessed by May Z. Shagrin the wife of Adolph Shagrin, and by the plaintiff Ben R. Federman. It is not claimed that Adolph Shagrin did anything more than observe the execution of the deed and take the acknowledgment of the signature by Edward Stanwyck. Both Adolph and May Shagrin then saw the plaintiff execute what appears to be a complete release of the note, and execute the cancellation of the mortgage. The cancellation of the mortgage was witnessed by May Shagrin. The note and mortgage are in evidence. These transactions were had on the evening of April 14th, 1948, and it was testified that the plaintiff was very concerned about having the matters properly recorded. This was done on the following day, April 15th, 1948. Adolph and May Shagrin testified to the visit to their home and to the execution of the instruments and stated that it was an especially happy affair and that the plaintiff was pleased and in a specially good mood. There is no doubt whatever in the Court's mind about the execution and delivery of the note and mortgage having been voluntarily made by the plaintiff for the purpose already stated.

The plaintiff himself now testifies that he remembers no such transaction and that he never voluntarily or knowingly executed the cancellation of either the note or the mortgage He is very hesitant about admitting his signature but he said "it looks like his signature."

For some time after the details last recited there was no evidence or misunderstanding or disagreement and the recitals of the parties as to how the dissatisfaction or disagreement came about are very far distant one from the other. The plaintiff says that the first he heard of the matter and the first that he knew of any cancellation of the note and mortgage was in April, 1949, when it came time to renew the fire insurance policy on the mortgaged premises. He states that the insurance company's representative spoke to him of the fact that the mortgage had been cancelled and therefore there would be no mortgage clause in his (plaintiff's) favor. The Stanwycks, defendants, claim that the first time that the

plaintiff raised any question about the matter was following a lawsuit tried in the Municipal Court of Cleveland in May, 1949, in which the plaintiff here was the plaintiff, which lawsuit resulted in a finding for the defendant. This action was instituted in August, 1949. The Stanwycks claim that the plaintiff insisted that Edward Stanwyck had heard a certain conversation between the plaintiff and the defendant in the Municipal Court lawsuit and he requested Edward to testify on behalf of the plaintiff in that action. Edward insisted that while he knew a conversation was had, he had not heard it and therefore could not truthfully testify. There is a claim that the plaintiff here insisted that Edward Stanwyck testify and that Edward Stanwyck continued to insist that he did not hear the conversation, and the Court believes he is correct in stating that Edward did testify to the effect that he had not heard the conversation. As already stated the plaintiff failed in his claim for recovery.

The answer to question No. 1 is one about which there can be no question. The plaintiff did execute the cancellation of the note and mortgage and did voluntarily deliver them to the Stanwyck defendants. It is not possible for any rational person to hear the evidence or peruse the record in this cause without arriving at that conclusion. We then proceed to seek the answer to No. 2, to-wit,—was such action on his part made without his knowledge, as he claims, or was it induced by fraud or undue influence, as he claims. It certainly was not made without his knowledge. The Court is fully satisfied that the plaintiff planned the entire program, that he was anxious to have it executed and that he was very pleased with the security afforded to the wife and two minor children and by what was then done. The Court is satisfied that plaintiff prepared the quitclaim deed and wrote the detailed cancellation of the note. (See Note.)

We then proceed to determine whether the action was induced by fraud or undue influence.

It is elementary of course that if the action was induced by undue influence or fraud the entire transaction would be vitiated. It is doubtful if the amended petition in this cause even states a cause of action on the basis of fraud or undue influence. We have a mere allegation of undue influence and fraud, and it has been clearly held that a mere allegation of undue influence is not a statement of fact but is a conclusion and is not sufficient to raise an issue. Barber Asphalt Paving Co., 188 Mo., 182 (Affirmed without opinion in 203 U. S., 585).

The Court would not be technical against full inquiry on a claim of undue influence or fraud, even though there be noth-

ing beyond a mere allegation in the petition itself. Full inquiry was permitted. There is not a scintilla of evidence by anybody, and certainly not by the plaintiff himself, to indicate any influence whatever, and certainly not fraud, beyond the claim that there was a confidential relationship between the parties. The testimony is eloquent in support of the fact that the plaintiff had every confidence in the defendants and that the defendants, naturally, had the utmost confidence in the plaintiff. There is no question whatever in the Court's mind about the relationship being one of mutual trust and confidence over the years, but it is to be noted that the plaintiff and the defendants were not living together excepting that the plaintiff upon occasion when ill and requiring special care would join the Stanwyck household. During all of the periods mentioned he was active, apparently perfectly alert, and a free agent, not in any manner subject to any influence by the Stanwyck defendants excepting insofar as his friendship and concern for them could be said to influence him.

It is very interesting to note too that the plaintiff claims in his amended petition that only two payments were ever made on the note and mortgage, and upon hearing claimed only three or four payments had been made. There is no evidence to indicate that he pressed for any payments, nor that he even mentioned the note and mortgage between the date of cancellation in April, 1948, and a date in April, 1949, —the latter being the date on which he claims to have discovered that the cancellation had been recorded. Able counsel for the plaintiff dwell at some length on the fact, often present in cases of undue influence and fraud, of a complete impoverishment of the donor by a gift and a resultant dependency or clear danger of it. This is not even a case of that character. It is true that the plaintiff testified that he has no property left other than a $2,000.00 mortgage executed by parties foreign to the transaction here in issue, and while his health is not what it used to be there is no evidence that he is not able to continue in his business, nor that he is not actually in business today as he has been for a number of years.

The cancellation of this mortgage was not an isolated act of generosity on the spur of the moment under pressure, but was a natural act, clearly free from pressure and engineered by the plaintiff himself along lines which he had followed over a long period of years as a result of his affection and regard for what became of the Stanwyck family. Based upon the facts developed upon trial the Court must conclude that the plaintiff did execute and deliver the note and mortgage, that

he did so voluntarily and without any undue influence or fraud of any character. Able counsel for plaintiff in their brief raise a question which on its face is not free from difficulty.

It is claimed that by reason of the confidential relationship existing between these parties over the years, and certainly existing in April, 1948, when the note and mortgage were cancelled, the plaintiff as a matter of law could not lawfully become the donor as between himself and the donees in this cause without independent and disinterested advice, and that it was the duty of the donees in a case such as the case at bar not to accept a gift without the donor being so counseled about it. Quite a number of cases are cited but most of those cited are cases decided by the courts of New Jersey. The Court has examined all the authorities cited, and others. It must be conceded that the courts of the state of New Jersey have clearly adopted the doctrine already mentioned touching independent and disinterested advice. Examination of those cases leaves one with the firm conviction that any court of equity would in any event have granted relief in those cases even without having to resort to the doctrine of independent advice.

The doctrine of independent advice has a dual purpose under the New Jersey authorities, and possibly others—

(a) to guard against undue influence or fraud, and (b) to protect the donor against the commission of an act highly improvident to him.

The Court will not burden this memorandum with the details in the cases cited in brief on behalf of the plaintiff, but will briefly mention one or two:

Slack v. Rees, 66 N. J. Eq. 447. In this case the gift was from father to daughter, but the normal relation of parent and child existing in earlier years had been reversed and the daughter was now the guardian of the father. The conveyance of property was made on the day before the father's death. He owned no other real estate and his personal property was insufficient for the payment of his debts. It was the daughter who took the old deeds to **her attorney** and ordered him to prepare new deeds for execution by her father.

82 Atl. 48, Ware v. Mulford, et al., (N. J.). This was a case of an illiterate woman approaching 90 years of age and suffering from a broken hip and as to whose mental impairment by age and illness there was conflicting evidence. She made a voluntary gift to a relative of all her property except a pension of $144.00 a year and unproductive real estate valued at about six or seven hundred dollars. The gift made the donor an object of charity.

153 Atl. 384, Kelly et al., v. Kelly (N. J.). This involved a transfer by a widow, aged, an invalid mother, of all of her property to her daughter when a close confidential relationship existed between the mother and daughter, and by reason of which gift the mother suffered impoverishment. The mother had four children but only the donee lived with the mother. The court calls attention to the fact that the transfer took place on July 18th, 1928, when—

"The ravages and progressiveness of her ailments had so sapped her vitality and powers of resistance that she took a turn for the worse. Her condition became precarious and her life was despaired of."

157 Pac. (2nd) Gillian v. Schoen (Supreme Court of Oregon). This case involved a conveyance by an 88 year old mother to her clergyman son with whom she lived at the time of her death. Due to the grievous illness it was claimed that she was weak, ailing and unsound of mind and body and mentally incapable of transacting business or understanding her affairs. She had other children with whom she was perfectly friendly, but they were wholly excluded. She was German and lived a German life and the court in Syllabus 8 says,—

"The reading of deed, by a scrivener, in English to aged grantor who had so slight a knowledge of English that she had difficulty in following even an ordinary conversation in English and who habitually spoke German was a meaningless procedure with regard to determination of whether deed reflected grantor's true intent or whether it was obtained by undue influence."

The above are typical illustrations of the facts which seem to have been developed in the cases cited, and they are certainly very far from any facts present in the case at bar. This leaves us with the sole question of the necessity of independent advice to the donor.

In 12 R. C. L., 953,—"The effect of fraud or undue influence," at page 954 it is said:

"In some jurisdictions the donee is required to prove that the donor had the benefit of the competent and independent advice of a disinterested third party * * *."

The States of Arkansas, New Jersey, Virginia and perhaps another are cited as the jurisdictions referred to. The Court has failed to find in the decisions of Ohio or in the texts referring to those decisions, any reference whatever to the rule and the Court is fully satisfied that the courts of Ohio have never adopted the rule, and that it is not in effect in Ohio. The general rules providing protection to innocents against undue influence or fraud are clear and do govern, and the

Court must hold that the Stanwyck defendants were not obligated to see to it that independent advice was afforded to the plaintiff in this case to stamp his action with validity.

While not expressing an opinion on the matter, it is possible that the plaintiff in this case was over-generous and that it would have been wiser for him to have retained his mortgage. The Court is satisfied that if such be the fact the situation now existing came about as a result of an error of judgment rather than any overreaching and that the Court is without authority to correct mere errors of uninfluenced judgment.